UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JAMES G. PAULSEN, Regional Director
of Region 29 of the National Labor Relations
Board, for and on behalf of NATIONAL
LABOR RELATIONS BOARD,

                                                 **MEMORANDUM & ORDER**

             Petitioner,               Civil Action No. 15-7054

     -against-

CSC HOLDINGS, LLC and CABLEVISION
SYSTEMS CORP.,

             Respondents.
--------------------------------------------------------X

**APPEARANCES:**

For Petitioner:
National Labor Relations Board, Region 29
Two MetroTech Center, Suite 5100
Brooklyn, NY 11201
By:    Matthew A. Jackson, Esq.
       Genaira L. Tyce, Esq.

For Respondents:
Kauff McGuire & Margolis LLP
950 Third Avenue
Fourteenth Floor
New York, New York 10022
By:    Kenneth A. Margolis, Esq.
       Daniel S. Kirschbaum, Esq.
       Kristina V. Hammond, Esq.

**HURLEY, Senior District Judge:**

Petitioner, Regional Director of Region 29 of the National Labor Relations Board

("petitioner" or "Board") commenced this action pursuant to Section 10(j) of the National Labor

Relations Act ("NLRA"), 29 U.S.C. § 160(j), seeking a preliminary injunction against

respondents CSC Holdings, LLC and Cablevision Systems Corp. (collectively "respondent" or

"Cablevision") pending the final disposition of a complaint, currently pending decision before Administrative Law Judge Mindy E. Landow and the Board, that alleges respondent has engaged in and is engaging in unfair labor practices within the mean of sections 8(a)(1) and (3) of the NLRA by discharging one employee, Dorothea Perry ("Perry"), in retaliation for her union activity and other protected concerted activity. For the reasons set forth below the injunction is denied.

## BACKGROUND

**I.     OVERVIEW OF DISPUTE**

Cablevision is a major provider of cable, internet and telephone communication services. One of its facilities is located in Jericho, New York and it is at that facility that Perry worked part-time as a representative in the TSG (technical support group) department for nearly 11 years before her termination on June 8, 2015. As a technical support representative, Perry handled incoming calls from customers for the purpose of addressing and trying to resolve whatever issue prompted their call, whether it related to billing, phone, television or internet.

On May 11, 2015 Perry sent an e-mail to James Dolan, Cablevision's Chief Executive Officer (the "May email"). The email began as follows:

> Dear Mr. Dolan,
> It has been three years since I last wrote you (see below). For a few years after your address to the TSG department and the concerns over unionization, it appeared that the unfair management and supervision practices of the department relaxed in favor of the employees. Now it appears that TSG  is again reverting back to the tactics it used to dismiss employees on a regular basis. As an example, we were told for a couple of years that we should take time needed to resolve all of the customer's issue, and not to rush the customer off the phone because our performance would no longer be based on handle time. Low and behold the handling time

metric is once again becoming a metric used to evaluate our performance. TSG management seemed befuddled that they could not use the metric to terminate people and would even occasionally attempt to coach on the handling time. I once reminded a supervisor that "Mr. Dolan said to take time to address the customer's concerns," and that is what I try to do. Our customers appreciate the time and need the attention which is why Optimum always scores high marks with J.D. Powers. To begin coaching on handle time will cause many techs to once agin rush customers off the phone leading to many more repeat calls and dissatisfaction with our technical support team. For your information, the low whispers of unionization have begun in the department because the staff is feeling less secure in their positions.

Ex. A-10 at GC 8. The email went on to raise concerns regarding the lengthy sign-in procedures caused by Genesys, a new software program, and a perceived unfairness regarding respondent's new Voice of the Customer ("VOC") initiative and the use under that initiative of a Net Promoter Score ("NPS") as part of the matrix whereby technical support representatives are evaluated. *Id.* Following the email, Perry reached out to the Communication Workers of America, AFL-CIO (the "Union") to inquire about organizing a union at the Jericho facility and began to assist the Union in soliciting support for unionization. Petitioner claims it was the foregoing that caused respondent to "precipitously discharge Perry - whom Respondent had recently praised in performance reviews as being an exceptional worker and a valuable contribution to the company," and "effectively end[] the Union organizing campaign." Pet.'s Mem. at 3.

Cablevision responds that Perry was terminated "due to her poor performance on a key customer service metric and her repeated refusal to take the steps necessary to improve her performance." Resps.'s Mem at 1. Specifically, "Perry's net promoter scores (the Company's most important customer service metric . . .) were dismal 'outliers' ranging from 17.9% to 20.9% for the three months preceding her termination, while her peers consistently scored in excess of

54% over that period. . . . [She] failed and refused to comply with the terms, standards, and requirements of a vitally important customer service initiative. *Id*.

## II.    SUMMARY OF HEARING TESTIMONY

The following is taken from the hearings held before Administrative Law Judge Landow on various dates between September 28, 2015 and October 30, 2015.[1]

### A.    Perry's Employment Background

Perry began working for Cablevision as a temporary employee in January 2004.  Six months later she was offered the opportunity to become a full-time employee. According to Cablevision, under its standard procedure, Perry was not required to interview for the position because she was already working for the company; she was given an employment application and background check authorization form to fill out, which she did and returned to Severo Mancebo, a Senior Recruiter at Cablevision. By signing the application, she certified that the answers were "true and complete" and acknowledged that "any false or misleading information" or "material omission" may result in discharge. Respondent contends the application was false in two respects.[2] First, Perry wrote that she left her former employer, Collegis, due to a "reorganization" when she had been advised in writing by Collegis that she was being terminated for poor job

---

[1] Petitioner has moved to have this matter heard on the administrative record (transcripts and exhibits) and a supplemental affidavit of Zelig Stern. Respondent opposes the motion only to the extent of seeking to submit two affidavits (with exhibits) of its own. Petitioner does not object to respondent's request.  Accordingly, the motion is granted to the extent that the Court shall consider the administrative record, together with the supplemental affidavits of Zelig, Comstock and Margolis (inclusive of exhibits) in determining this matter. The supplemental affidavits relate to the just and proper portion of the Court's analysis and are discussed in that section of this memorandum.

[2] Cablevision became aware of these falsifications while preparing for the hearing before the ALJ. Ex. A-7 at 967.

performance. Second, she omitted to put down that she was employed at the time by the New York City Department of Information Technology and Telecommunications ("DoITT) although the application required her to disclose her most recent employment. According to Perry, she was interviewed by a Cablevision employee and she had explained to the interviewer that, despite what she wrote on the application, the real reason she was terminated was because she reported finding child pornography on one of the company's computer and that she had a wrongful termination lawsuit pending against Collegis. She further testified that she also told the interviewer she needed a part-time position because she had a full-time day job. Exs. A-2 at 237-246; A-8 at 1062-76, 1097-1101; A-11 at RX 1, 2, & 3.

Perry worked part-time at Cablevision's Jericho call center as one of approximately 400 Technical Support Representatives (TSRs) handling incoming calls from Cablevision customers to try to address and resolve various issues regarding respondent's cable, internet and telephone services. Prior to Perry's May email to respondent's CEO referenced above, Perry had eight warnings and performance improvement plans for her failure to meet performance metrics and for her violation of company policies, with the last disciplinary notice issues in March 2011. In her 2013 and 2014 annual performance appraisals, Perry was cited as having "strong performance" and making a "valuable contribution." Exs. A-1 at 35-37, 65-66; A-2 at 259-69; A-3 at 280-88; A-5 at 643; A-10 at GC 41; A-11 at R 4-12, 17.

**B.    The 2012 Email**

Perry sent her first email to Dolan on February 28, 2012. The email was written after Dolan addressed employees in a video in which he provided his e-mail address and told employees that they should contact him if they had any problems or concerns and that the

company would no longer use the Total Average Handling Time call-handling metric ("TAHT") to evaluate TSR performance because he wanted employees to take their time to fully address each customer's issues. Dolan's address occurred shortly after certain employees in respondent's Brooklyn facility voted to unionize. Ex. A-1 at 73-77.[3]

Taking him up on his invitation, Perry sent the 2012 email to Dolan raising certain concerns she had and stating that "it has come to a point at Cablevision - especially at TSG where I work - that consideration of unionization might be warranted." Although Perry testified that she received no response to her 2012 email, there are three emails from respondent's human resources department attempting to set up a meeting to address her concerns. It is not alleged, however, that this 2012 email provoked any adverse actions against Perry. She received no disciplinary warnings and her annual ratings thereafter were unaffected. She continued to invoke Cablevision's open door policy to raise her concerns on various topics. Exs. A-1 at 70, 78-83; A-3 at 293; A-10 at GC 6,7; A-11 at R 13.

### C. Cablevision's VOC Initiative

In January 2015 Cablevision launched a new initiative entitled "Voice of the Customer" ("VOC"). VOC is a "key customer experience goal" for all Cablevision employees who deal with customers. Respondent describes it as follows:

> In practice, VOC is a multi-question survey sent to all

---

[3] Referencing the decision in *CSC Holdings, LLC*, 2014 WL 6853881 (NLRB Div. of Judges, Dec. 4. 2014), petitioner asserts that since the successful unionization of certain Brooklyn employees, "respondent had engaged in an aggressive campaign against the union with the objective of preventing employees in other facilities from organizing" including the "discharge of 22 employees in retaliation for their activities in support of the Union" and "the unlawful granting of wage increases to non-union employees to discourage them from organizing." Pet.'s Mem. at 5.

customers who interact with Company employees. Under the VOC system, each employee receives a Net Promoter Score ("NPS") based on how a customer answers the first question on the survey, "[b]ased on your recent phone call, how likely are you to recommend Optimum to your friends and family." The Company focuses on this question because it is considered throughout the industry - including at companies like Apple, Google and Amazon - to be the best way to evaluate and improve the customer experience and build customer loyalty. Customers can answer on a scale of zero to ten. Employees who score a 9 or 10 on that survey are considered to be "promoters," while responses of 7 or 8 are considered "passive," and scores of 6 or below are considered to be "detractors." In order to calculate an employee's NPS, the Company essentially subtracts the number of detractor scores from the number of promoter scores the employee received; passive ratings do not count. Employees are then ranked against similarly situated co-workers. NPS, in turn became one of the four key performance metrics on the employee scorecard used to evaluate TSG representatives like Perry; it counted for 30% of the employee's score - the greatest weight of any of the key metrics.

Resps.'s Mem. at 7 (supporting record citations omitted). In implementing VOC and NPS, Cablevision sent out communications, held focus groups to answer questions, provided coaching during one-on-one supervisor meetings and team meetings and held computer based training. Exs. A-5 at 587, 656-59, 679-80; A-6 at 697-700; A-11 at R 34, 37.

According to Val Mohip, Perry's supervisor, he spoke extensively with Perry about NPS during their one-on-one meetings and coaching sessions and encouraged her to go to both mandatory and non-mandatory training on NPS. When Mohip asked Perry whether she had attended at least one of the training sessions, she told him "yes, she did, but she just went for the food" and complained that it was not fair she was being judged on a question about the company and not her own performance. Respondent's performance management database, UConnex, contains notes of these discussions. According to Perry, she did not receive much coaching

because even supervisors did not understand NPS and she denied that the discussions documented in Uconnex ever took place. Exs. A-3 at 352-53, 362; A-5 at 583-88, 598, 604, 613-14; A-8 at 1115; A-10 at GC 34; A-11 at R 25, 41.

### D. Perry's Organizing Activities

Perry testified that by May 2015 she and her co-workers had began discussing concerns about workplace changes, including what they thought was the reintroduction of TAHT and the introduction of VOC and NPS, as well as the idea of unionizing as a means to protect themselves against what they viewed as unfair changes. On May 11, 2015 she sent her second email - the May email - to Dolan. She claims that although she did not tell anyone about the May email, news of it spread quickly and a number of employees thanked her for conveying their shared concerns. Exs. A-1 at 85-92, 134-35; A-10 at GC 8.

Sometime after the May email to Dolan, Perry spoke to Tim Dubnau and Zelig Stern of the Union about organizing the employees at her workplace.[4] They invited her to meetings (which she did not attend) and asked her to speak with her co-workers. According to Perry, during breaks and downtime she would speak to her co-workers, providing them with contact information for the Union organizer and encouraging them to attend organizational meetings, as well as collecting their email addresses and emailing them updates about the Union's organizing efforts.[5] Nadine Gyles, a former co-worker[6] of Perry's testified that Perry spoke to workers at the

---

[4] It is unclear from the record when that conversation took place. Perry testified that she called the union "after I wrote – on or about the time I wrote the email to James Dolan." Ex.A-1 at 113. Stern testified about setting up a June 3 meeting and having spoken to Perry shortly before that. Ex. A-3 at 423-27.

[5] Again it is unclear when these activities took place but it would appear they occurred sometime after the May email to Dolan was "escalated." Perry testified that after speaking with

Jericho facility about organizing and encouraged them to attend Union meetings. While Stern also confirmed that Perry contacted the Union and subsequently organized and encouraged Cablevision employees to attend Union meeting, his affidavit states that she "introduced [him] to approximately three people via email." There was no evidence presented that union literature or cards were being circulated. The two organizing meetings that were held had only two or three participants. Exs. A-1 at 113-15, 120-25; A-2 at 185-89; A-3 at 423-27, 430-32; B at 2-4.

While respondent was obviously aware of Perry's May 2015 email to Dolan, there is conflicting testimony as to whether any supervisors had knowledge of Perry's activities on behalf of the Union. Petitioner points to Perry's testimony to support its assertion that at least two supervisors, Val Mohip, Perry's direct supervisor, and Anthony Maharaj another TSG supervisor, were aware of Perry's activities on behalf of the Union. According to Perry, during a monthly one-on-one performance review with Mohip, Maharaj approached Perry and asked her for information about an upcoming Union meeting; she wrote down the information and gave it to him. Five minutes later, Maharaj returned with another employee and again asked Perry to provide him information about the Union meeting; Perry again wrote it down and handed it to the employee. After the one-on one meeting with Mohip, Perry went over to Maharaj and he then lead her around the office directing her attention to various employees he thought were

_____

Stern and Zelig she disseminated information to co-workers about the upcoming meeting at "an IKEA food court" which was in "the third week of May." A-1 at 121, 126. According to Zelig's testimony, the meeting at Ikea was initiated and took place after the first meeting with call center employees which occurred in early June. Ex. A-3 at 423–25, 427-30. Gyles testified that she spoke to Perry about the union "in May, like towards like probably the end of May." Ex. A-2 at 188.

[6] Gyles left Cablevision after a child care leave was denied but with Perry's help secured a new position with Perry's current employer, DoITT. Exs. A-2 at 185; A-11 at R 55.

trustworthy and interested in the Union. Gyles testified that after Perry's termination, Mohip and Maharaj teased her about being in cohorts with Perry in organizing the Union and Mohip stated that from what he understood, Perry's union activity was the reason for her discharge. Exs. A-1 at 136-59; A-2 at 198-207.

Mohip, however, testified that he was unaware of any union activity during the period May and June 2015, including any such activity by Perry. He denied ever hearing Maharaj ask about a Union meeting or Gyles being teased about being in cohorts with Perry; he also denied that he ever had a conversation with Gyles and Maharaj regarding the reason for Perry's termination. Maharaj similarly testified that he was unaware of any union activity at the Jericho facility in May and June of 2015 or of any connection between either Perry or Gyles and a union, that he never asked Perry about a union meeting or pointed out to her employees he thought might be interested in a union, and that he never had or witnessed a conversation with Gyles regarding being in cohorts with Perry in organizing a union or regarding the reason for Perry's termination. Ex. A-5 at 582-84, 590-93, 623-29, 631-33.

E.    The May Email to Dolan

On May 11, 2015 Perry sent her email to Dolan. In very short order, it was forwarded to the Cablevision's Executive Vice President of Human Resources who forward it to Paul Hilber, Senior Vice President of Human Resources, asking him to "get us the facts." Hilber then forwarded it to the Yvette Panno, the Regional HR Director, directing her to "Please have this investigated immediately." According to respondent, complaints to the Cablevision's CEO are given high priority and it is standard operating procedure to collect an employee's entire employment history when s/he takes advantage of the open door policy. Panno thus collected and

reviewed Perry's file and spoke with some of Perry's current and former supervisors. Among other things she gathered Perry's attendance and leave records, her performance metrics (specifically requesting those metrics where Perry scored significantly below her peers), and records of coaching. She arranged for a meeting with Perry to discuss the concerns in her email. That meeting took place on May 18, 2015. Perry's and Panno's accounts of that meeting differ in some important respects. Exs. A-1 at 84-85; A-3 at 316-17, 395, A-7 at 914-30; A-10 at GC 8; A-11 at R 18.

According to Panno, at the May 18 meeting she and Perry spoke about the three concerns expressed in her email: the lengthy Genesys sign-in procedure, the allegedly unfair nature of the VOC performance metric and the alleged biased management practices. Regarding the VOC/NPS metric, Perry told Panno it was unfair and was merely a way to terminate employees, with Perry stating "she was not a proponent of the metric and she disagreed with the metric." Perry told Panno that she had only gone to NPS training in order to get the fruit salad that was provided. Panno recommended that Perry attend additional training and information sessions regarding NPS, but Perry refused. Perry also refused to attend any focus groups regarding NPS, telling Panno, it would not change her position on NPS as she was firm in her position. Panno also suggested Perry meet with the interim director of the call center and the Regional Vice President regarding NPS but Perry declined. Finally during the meeting and in response to Perry's email references to unionization, Panno expressed her opinion about unions and informed Perry that the VOC/NPS metrics were being used across Cablevision, including Brooklyn which has unionized

employees.[7] Ex. A-7 at 914-1005.

According to Perry, during the May 18 meeting she told Panno she wrote the email to express the fear and concern that her co-workers had. In response, Panno said a union would not be good for employees because it would only serve as an impediment between employees and the company and a union would not protect employees against the new performance metrics. Panno even mentioned that the unionized workforce in Brooklyn were subject to the same metrics as non-union employees and Brooklyn employees were trying to decertify the Union. Perry responded that she had prior experience working with a union and her opinion was that a union would be beneficial and help employees in Jericho. On the issue of VOC and NPS, Perry said employees perceived NPS as unfair. Panno replied that it was an important performance metric and asked Perry if she had received any training on NPS. Perry replied no, that the closest she came was when she inadvertently went into such a meeting for a brief period and took some fruit. Perry said she took an online training course regarding NPS but it was ineffective and she did not understand, and believed half the employees and many supervisors did not understand, NPS. Panno then told Perry she saw her "as a leader" and asked if she had attended any focus group meetings. Perry said she had not been invited to any but no number of focus groups would change Perry's opinion that NPS was inherently unfair. Perry denied that Panno asked her to take additional training or that she refused such training. Panno allegedly told Perry that her performance metrics were good. Ex. A-1 at 95-114.

Panno continued to investigate Perry and her complaints after the May 18 meeting. That

_____

[7] As a result of their discussion, Panno determined that the claim of unfair management and supervisor practice was unfounded. Cablevision did, however, review the log-in procedures and provided employees with additional training on Genesys.

investigation revealed that Perry was performing below the company's standards and her NPS score was significantly below that of her peers; Perry was flagged for additional coaching by her supervisor in both February and March and by April an action plan was being drafted. Perry's normalized NPS scores were 17.9%, 20.9% and 19.2% for March April and May as compared to 54.8%, 54.9 % and 54.9% for her peer group for the same period. Although during this period she was counseled by her supervisor on ways to improve, she did not. The investigation also revealed that Perry's managers expressed concern about Perry's behavior in the workplace. Exs. A-6 at 711-24; A-7 at 941-45; A-11 at R 22, 39, 40, 41, 47.

On May 25 and June 1 Perry sent additional emails to Panno complaining about NPS. The first stating, in part, it was "completely unfair to the tech and I stand by that no matter how many focus groups you ask me to attend." The second email referring to NPS as "a pointless metric to measure employee performance." Panno viewed the emails as demonstrative of Perry's unwillingness to improve her performance measures. Exs. A-7 at 948-49, 974; A-10 at GC 14; A-11 at R 47.

## F.     Perry's Discharge

Panno discussed her investigation with number of Cablevision executives, including John Tucci, the interim director of the Jericho call center, Lisa Gillingham, Senior Vice President of Customer Service, and Paul Hilber. On June 1, she emailed Gillingham with a recommendation to terminate Perry. Gillingham testified that Perry was terminated for " a combination of the fact that she had substandard NPS performance, which was a skill issue, and her behavior affirmatively indicated that she was unwilling to attend the training, or the focus group, or to do anything to improve that, which was a will issue. She admitted, however, that she

13

and Panno spoke about Perry's comments regarding unions and her email to Dolan but could not recall details of that discussion. Gillingham approved the recommendation to terminate Perry on June 2. Exs. A-4 at 456, 505-08, 522-23; A-6 at 753; A-7 at 953; A-8 at 1048-52; A-11 at R-49.

Panno and Tucci met with Perry on June 8 to inform her of her termination. Again, Perry's testimony of that meeting and that of Tucci and Panno are at odds in certain respects.

Perry described the meeting as follow. Tucci began the meeting by saying that he called the meeting because he wanted to follow up on Perry's communication with senior management. Perry then explained the issues she had raised in her email to Dolan. Tucci replied that Perry's employment was being terminated because she did not "believe in the direction of the company." Perry asked why she was being terminated - did she do something wrong or was there a problem with her performance metrics. Tucci said her discharge had nothing to do with her metrics. After Perry continued to press for an explanation, Tucci said that she had "used strong words." Perry asked Panno and Prochazka (human resources manager) whether she was being fired because of her email to Dolan and neither woman replied. Perry became upset, accusing Panno of setting her up. Two security guards came into the room and to escort Perry out of the building. She insisted she be allowed to collect her bag from her desk. On the way back to her desk in the middle of the call center, Perry yelled out "Do not trust James Dolan! Don't email James Dolan! Do not contact Human Resources! They are not here to help you! If you have any problems, do not say anything or you will be terminated like me!" A-2 at 209-17.

As related by Panno and Tucci, the meeting went as follows. Tucci read from prepared talking points, telling Perry that she had been spoken to about her performance and that she had refused to attend additional training, indicated that she disagreed with the Cablevision's use of

NPS and the metrics, and had an unwillingness to help improve the customer experience. Panno then tried to explain the severance package that Cablevision was offering her. Perry became upset, raising her voice and gesturing with hands. She attacked Panno on a personal level and accused Panno of setting her up, lying to her and betraying her. At that point Tucci told Perry that those were strong words to use. When Tucci referenced how Perry had only gone to NPS training for the food, Perry told him he needed to leave. Tucci and Panno left and decided to call security. Panno returned with Prochazka and they again tried to review the severance package. At the conclusion of the meeting, Prochazka and security escorted Perry to retrieve her belonging during which the outburst by Perry described above occurred. A-6 at 754-62; A-7 at 955-58.

## DISCUSSION

### I.    Standard for Relief Pursuant to Section 10(j)

Section 10(j) of the NLRA provides, in relevant part, that "the Board shall have the power, upon issuance of a complaint . . . charging that any person has engaged or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). Relief under this section is proper if the district court finds "(1) reasonable cause to believe that an unfair labor practice has occurred; and (2) that granting injunctive relief would be just and proper." *Silverman v. J.R.L. Food Corp.*, 196 F.2d 334, 335 (2d Cir. 1999); *accord Kreisberg v. Healthbridge Management, LLC*, 732 F.3d 131, 141 (2d Cir. 2013).

In examining reasonable cause, a district court "need not make a final determination that the conduct in question is an unfair labor practice." *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 365 (2d Cir. 2001). Rather, "[i]t need only find reasonable cause to support such a

conclusion.  Appropriate deference must be shown to the judgment of the NLRB and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed." *Hoffman v. Polycast Tech. Div. of Uniroyal Tech, Corp.*, 79 F.3d 331 (1996); *accord Silverman*, 196 F.3d at 335*; see also Kaynard v. Mego Corp*, 633 F.2d 1026, 1031 (2d Cir. 1980) (A court should sustain "the Regional Director's version of the facts . . . if within the range of rationality, [and] inferences from the facts should be drawn in favor of the charging party[;] . . . even on issues of law, the district court should be hospitable to the views of General Counsel, however, novel." ); *Danielson v. Joint Bd. of Coat, Suit, & Allied Garment Workers Union*, 494 F.2d 1230, 1245 (2d Cir. 1975) ("When 'reasonable cause to believe' turns on disputed issues of fact, the Regional Director may assume those in favor of the charge and the district court should sustain him if his choice is within the range of rationality.").  The requirement of  "reasonable cause" is satisfied where the Regional Director has come forward with evidence "sufficient to spell out a likelihood of violation." *Id.* at 1243 (internal quotations omitted).

"[I]njunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm and to preserve the status quo. While this standard preserves traditional equitable principles governing injunctive relief, [courts should be] mindful to apply them in the context of federal labor laws." *Hoffman*, 247 F.3d 360. Nonetheless, "issuing an injunction under 10(j) 'is an extraordinary remedy indeed.' " *Kreisberg*, 732 F.3d at 141 (quoting *Kaynard*, 633 F.2d at 1033.

**II.    Whether Petitioner has Demonstrated Reasonable Cause
        to Believe That an Unfair Labor Practice Has Occurred**

The Court's analysis begins with the reasonable cause prong of the § 10(j) inquiry.  To

succeed, petitioner must demonstrate that there is reasonable cause to believe that respondent

violated sections 8(a)(1) and 8(a)(3) of the NLRA.

Section 8(a)(1) provides that it is an "unfair labor practice for an employer to interfere

with, restrain, or coerce employees in the[ir] exercise of their right" to "self-organization to form,

join, or assist labor organizations, to bargain collectively through representatives of their own

choosing, and to engage in other concerted activities for the purpose of collective bargaining or

other mutual aid or protection." 29 U.S.C. §§ 157, 158(a)(1).

Section 8(a)(3) provides that it is an unfair labor practice for an employer "by

discrimination in regard to hire or tenure of employment or any term or condition of employment

to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3).

An employer that violates section 8(a)(3) of the NLRA also commits a "derivative" violation of

Section 8(a)(1) of the NLRA. *See*, e.g., *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n. 4.

(1983). Petitioner's memorandum discusses only section 8(a)(3) thereby impliedly relying on a

derivative violation of  section 8(a)(1).  The Court will therefore limit its discussion to section

8(a)(3).

An employer violates section 8(a)(3) if it "fires an employee for having engaged in union

activities and has no other basis for the discharge, or if the reasons that [it] proffers are

pretextual." *NLRB v. Transp. Mgmt. Corp*., 462 U.S. 393, 398 (1983).  Alleged violations of

section 8(a)(3) are analyzed under a burden-shifting framework. "First, the General Counsel of

the Board must demonstrate that (1) the employee was engaged in protected activity, (2) the employer was aware of this activity, and (3) the employee's protected union activity was a substantial or motivating factor behind the employer's decision to take adverse employment action." *NLRB v. Matros Automated Elect. Constr. Corp.*, 366 Fed. Appx. 184, 187 (2d Cir. 2010); *see Local One, Amal. Lithographers v. NLRB*, 729 F.2d 172 (2d Cir. 1984). If the General Counsel sustains its burden, then the burden shifts to the employer to prove "that the discharge would have occurred in any event and for valid reasons." *Transp. Mgmt. Corp.*, 462 U.S. at 400. "If the employer's proffered reason for the adverse employment action is shown to be pretextual, then the employer will be found not to have carried its burden." *Matros Automated*, 366 Fed. Appx. at 187 (citing *NLRB v. SE Nicholls, Inc.*, 862 F.2d 952, 957 (2d Cir. 1988)).

### A.       Protected Activity

Petitioner's assertion that Perry engaged in protected activity is within the range of rationality. First, there is the evidence that she was attempting to assist in organizing employees in furtherance of unionization campaign, including providing the Union with information on employees that might be interested in organizing. Second, the work-related complaints she raised in her May email to Dolan fall within the rubric of concerted activity. Concerted activity, the right to which is guaranteed under section 7 of the Act, is activity engaged in with or on the authority of other employees and not merely on behalf of one's self and includes when an employee seeks "to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." *Myers Industries*, 281 NLRB 822, 887 (1986). Concerted activity "includes the actions of a single employee, acting alone, who intends to initiate group activity" because to "protect concerted activities in full bloom, protection must necessarily

18

be extended to intended, contemplated to even referred to group action, lest employer retaliation destroy the bud of employee initiative aimed at bettering terms of employment and working conditions." *NLRB v. Caval Tool Division*, *Chromalloy Gas Turbine Corp.*, 262 F.3d 184, 188 (2d Cir. 2001) (internal quotation marks omitted). According to Perry, she had discussions with her co-workers regarding complaints about the performance metrics and log-in procedures and the issues she raised in the email reflected these collective complaints.

## B.    Employer's Knowledge of Protected Activity

Petitioner argues that Cablevision had knowledge of Perry's protected activity (1) because it undeniably had knowledge of the May email to Dolan and (2) the evidence establishes that supervisors Mohip and Maharaj knew of Perry's union organizing activities which knowledge is imputable to Cablevision.

Turning first to the May email, it does not plainly state that Perry advocates unionization, although the statements that "low whispers of unionization have begun in the department" and that the "suffering of the little people is what makes the whispers of 'unionization' become a reality" can be read to suggest, in the context of the May email, that Perry's complaints were shared by others and that she supported unionization. But even in the absence of that suggestion, there is Perry's testimony that she told Panno during their May 18 meeting that her opinion was that a union would be beneficial to the employees in Jericho.

As to whether supervisors Mohip and Maharaj had knowledge of Perry's organizing activities the testimony is conflicting. While Perry testified to Maharaj helping her and asking her about a union meeting in front of Mohip, both men denied that any such events took place. And while the Court's review of the transcript gives it pause as to the veracity of Perry's testimony, it

is not for this Court to make credibility determinations on the instant application. Accepting for purposes of this application the veracity of Perry's testimony, Mohip and Maharaj would have known about her organizing activities sometime in the latter part of May and such knowledge may be imputed to Cablevision. *See, e.g., The Parkside Group*, 354 NLRB 801, 804 n. 18 (2009) ("A supervisor knowledge of protected activity can be imputed to upper management where the employer does not establish a credible evidentiary basis for rejecting such imputation.")

### C.     Protected Activity as a Motivating Factor/Anti-Union Animus

To support its claim that Perry's protected activity was a motivating factor in her termination, petitioner argues that Cablevision's exhibited an anti-union animus as demonstrated by Panno's statement at the May 18 meeting and Administrative Law Judge Fish's decision in *CSC Holdings*, 2014 WL 6853881 (Dec. 4, 2014).

Perry testified that Panno told her at the May 18 meeting that "the union would basically be an intermediary between human resources or the company and the employee," and that a union would not protect employees against the new performance metrics. Panno further mentioned that the unionized workforce in Brooklyn were subject to the same metrics as non-union employees and Brooklyn employees were trying to decertify the Union. The comments as testified to by Perry, however, do not violate the act as an "employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, as well as objective facts, so long as the communications do not contain a 'threat or reprisal or force or promise of benefit.'" *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).

Nor does Judge Fish's recommended decision provide support for an anti-union animus in this case. The allegations in that matter relate to activities in 2012 and early 2013 at Cablevision's

Brooklyn and Bronx facilities with employees in different job categories. Petitioner has not directed the Court's attention to any particular portion of that lengthy decision which would permit one to infer the existence of an anti-union animus in this case. Moreover, respondent advises this Court that that decision is currently on review before the Board. Resps.'s Mem. at 27. *See, e.g., Earthgrains Co.*, 338 NLRB 845, 853 (2003) (affirming decision of ALJ that prior case was not sufficiently similar in nature or participants to provide evidence of unlawful motive or animus). Also telling, in this Court's view, is that Perry suffered no adverse consequences as a result of her 2012 email, sent during the active period of unionization at Cablevision's Brooklyn and Bronx facilities, in which she advocated for unionization.

Petitioner also points to circumstantial evidence to support its claim of respondent's unlawful motive including the "swiftness with which it launched its investigation of Perry" - i.e. within minutes of her May email. However, that investigation was launched prior to the Perry contacting the union, prior to her May 18 meeting with Panno where she allegedly made statements supporting unionization of TSRs, and prior to when Maharaj allegedly asked her about union meetings and pointed out those who could be trusted. *See* notes 4 and 5 *supra.* Thus, there is no evidence to contradict the testimony that the escalation was standard operating procedure whenever an employee takes advantage of the company's open door policy.[8]

Nor does Perry's termination without any prior warning or corrective "action plan" support, as urged by petitioner, a discriminatory animus. Cablevision's employee handbook

---

[8] The response to Perry's 2012 email was nearly as swift and there is no claim that that email resulted in any adverse consequences. The email was sent on February 28, 2012 at 12:01 am, *see* Ex. 8-10 at GC 8, and at 9:58 am that same day the then Senior Vice President of Human Resources emailed Perry that he had received a copy and asked someone from his HR team to reach out to her and discuss her issues, *see id.* at GC 7.

provides that it may "take corrective action up to and including termination of employment without prior corrective action where, for example, there are serious infractions of Company policies or of the Company believes that additional corrective action is unlikely to resolve the problem." Ex. A-11 at R 19. According to the evidence, by April (before her May email to Dolan) an action plan was being drafted to address Perry's poor NPS scores. Exs. A-6 at 713-29; A-7 at 942-43, A-10 GC at 24; A-11 at R 39. It was in May that Cablevision became aware of Perry's admittedly hostile attitude to Cablevision's VOC initiative and its concomitant use of NPS. Given that hostile attitude, corrective action was not likely to resolve Perry's outlier performance.

In sum, petitioner has not submitted sufficient evidence to demonstrate that anti-union animus as a motivating factor in Perry's termination. In any event, as discussed in the next section, there is overwhelming evidence that Perry's termination was for a valid non-pretextual reason.

### D.    The Reason for Perry's Termination

Cablevision's proffered reason's for Perry's termination is "a combination of her extremely poor performance with respect to NPS and her refusal to learn and even try to perform anywhere close to the level of her peers on the Company's legitimate performance metrics." Resps.'s Mem. at 18. It is to the evidence regarding this contention that the Court now turns.

It is undisputed that Cablevision launched its VOC initiative and the use of NPS as a performance metric in January 2015. Given Cablevision's reliance on Perry's poor NPS scores, its is Perry's performance after the adoption of VOC that provides the relevant parameters.[9] The

---

[9] Perry's performance in January 2015 is not considered as according to Cablevision, when it launches a new process, it gives employees a month to adjust and while it has scores for that month, it does use them for evaluation purposes. Ex. A-6 at 719.

documentary evidence submitted demonstrates that in February, March, and April 2015 her scores lagged so far below that of her peers that she was flagged as an "outlier" and that her supervisor counseled her about VOC and on improving her NPS score. Ex. A-11 at R 39, 41; *see* Ex. A-6 at 713-24.

Coupled with Perry's documented poor NPS scores, is her admitted hostility to Cablevision's initiative to improve customer service. When during the May 18 meeting Panno suggested that Perry attend one of the focus groups on VOC and NPS she replied "it wouldn't change my position on NPS, certain system, certain things that I was firm in my belief, you know." Ex. A-1 at 105. She followed that statement up with similar statements such as "NPS is one of those metrics that is completely unfair to the tech and I stand by that no matter how many focus groups you ask me to attend. . . . I believe NPS is being used as a tool to terminate employees," Ex. A-10 at GC 11, and "NPS should be sued for information purposes, it's a pointless metric to measure employee performance," *id.* at GC 14. Additionally, Perry admitted she did not know what NPS stood for or how it worked, despite Cablevision efforts to educate employees on NPS. Exs. A-1 at 86-87; A-3 at 350-51. There is substantial evidence that Perry simply refused to take advantage of the resources offered to improve her NPS score, including telling three different supervisors that she did not participate in NPS training and only went to the sessions for the fruit that was being served, stating she would stay opposed to NPS "no matter how many focus groups" she was sent to, and her stated opinion that NPS was "pointless." Exs. A-1 at 103, A-9 at 1176; A-10 at GC 14; A-11at R 11 & 41.  Perry's own words support Cablevision's determination that her behavior affirmatively indicated "a will issue." Ex. A-7 at 953; *see also* Ex. A-10 at GC-18 (Email from Hilber to Perry stating that "Related to your

separation . . . as we build our organization to provide and support world class service we need employees that are aligned with our vision, strategy and approach as well as those that can meet or exceed our performance expectations."). Given her attitude, that Cablevision made the decision to terminate Perry without attempting corrective action provides no support for petitioner's assertion of pretext.

Nor does the record support that Perry was told she was being terminated for "using strong words," which petitioner describes as a euphemism for union activity. Pet.'s Mem. at 39. While Perry may have testified at the hearing that Tucci told her that, Tucci's testimony is to the contrary. More importantly, petitioner's reliance on Perry's testimony ignores that neither Perry's June 9, 2015 email to Zelig informing him of her termination (Ex. A-11 at R 31), nor her June 8, 2015 email to Dolan concerning her termination (Ex. A-10 at GC 17), both of which were sent within hours of her termination, reference her being terminated for using "strong words." Rather, her email to Zelig recites the reason she was given for her termination as " 'I didn't support the direction the company was going in.' " Similarly, her email to Dolan states "Tucci explained that 'since I didn't agree with the direction the company was going in my employment was being terminated[.]' "[10]

In sum, the record evidence does not support reasonable cause to believe that Cablevision violated sections 8(a)(1) and (3) when it terminated Perry. In addition, as discussed in the next section, even if petitioner has demonstrated reasonable cause to conclude that Cablevision violated sections 8(a)(1) and (3) of the NLRA, interim relief is not just and proper in this case.

---

[10] Perry's first reference to being terminated for using strong words is in a June 16, 2015 email addressed to Hilber and copied to Stern and counsel for the union. *See* Ex. A-10 at GC 19.

**III.      Whether Issuance of an Injunction Would be Just and Proper**

"Injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo." *Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d 462, 469 (2d Cir. 2014) (internal quotation marks omitted). The status quo that must be preserved or restored is that which "existed before the onset of unfair labor practices." *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975). As to irreparable harm, district courts consider "whether the employees' collective bargaining rights may be undermined by the . . . [alleged] unfair labor practices and whether any further delay may impair or undermine such bargaining in the future." *HealthBridge*, 732 F.3d at 142 (internal quotation marks omitted). The "main focus of a section 10(j) analysis should be on harm to organizational efforts." Paulsen v. Remington Lodging & Hosp., 773 F.3d 462, 469 (2d Cir. 2014).

A Court may properly consider petitioner's delay in seeking relief pursuant to section 10(j). *See Seeler v. H.G. Page & Sons, Inc.*, 540 F. Supp. 77, 79 (S.D.N.Y. 1982) ("Board's inaction is the most compelling evidence against the need for intervention by this court"); *but cf. Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 n.4 (rejecting as insubstantial the claim that Board unduly delayed in seeking relief). Here, the Union filed a charge against respondent on June 18, 2015. The Complaint and Notice of Hearing was thereafter issued by the Regional Director on August 24, 2015.  Testimony before Administrative Law Judge Mindy E. Landow was taken on various dates between September 28, 2015 and October 30, 2015.  The instant petition was filed six weeks later on December 10, 2015, six months after Perry's termination.  Given the petitioner's argument that "Perry was the face of the Union campaign in Jericho and as a result of her termination, 'everything was shut down,' " one would expect that an application for  §10(j)

relief would have been made on a more timely basis.

Putting aside the issue of delay, the balance of the equities does not support injunctive relief. First, Perry is not entitled to reinstatement in view of her failure to truthfully answer employment history questions on her application. On her employment application with respondent, Perry wrote that she left her former employer, Collegis, due to "reorganization." However, Collegis had informed her that she was being terminated for poor performance and she contends she was terminated because she reported finding child pornography on a computer. "Regardless of which story is true, Perry lied when she certified that 'reorganization' was the reason for her prior termination." Resp.'s Mem at 5.[11] That Perry contends she advised an interviewer of her employment history, even if true, does not change the fact that she lied when she certified that the answers given on her application were true. An employer may rightfully rely on such a certification and terminate an employee who lies on an employment application no matter the nature of the untruth. *Cf. Robinson v. NYC Health Dept.*, 2001 WL 863418, *6 (July 30, 2001) (termination for misrepresentations during employment application process is a legitimate reason).

Nor is this a case in which the failure to reinstate will frustrate an organizing campaign that is in progress. First, while Perry may have contacted the union, she did not attend any union organizational meeting prior to her termination. Ex. A-1 at 125. Second, the evidence presented shows at best minimal activity that does not rise to the level of a campaign. There was barely any interest in the union at the time of Perry's termination. There was only one employee other than

---

[11] Perry also failed to disclose on her application that she was employed by the New York City Department of Information Technology and Telecommunications ("DoITT").

Perry that expressed interest in the union and that employee was discouraged and thought any organizing activity should be abandoned due to lack of interest *before* Perry was terminated. *See* Ex. B at 3. There were two organizing meetings held and they only had two or three participants. *See* Ex. B at 2-3. Finally, evidence has been presented that Perry continues to actively support the Union by emailing her former co-workers. *See, e.g.,* Margolis Declar. Exs. 13-16. Thus, any further delay will not undermine collective bargaining rights.[12]

Finally, petitioner's argument that Perry's interim reinstatement is appropriate as it would "reduce the likelihood that she will have moved on to another job and thus be unavailable for reinstatement by the time of a final Board order" is unavailing as "section 10(j) should be applied in the public interest and not in vindication of purely private rights." *Seeler*, 517 F.2d at 40.

## CONCLUSION

For the reasons indicated, petitioner's application is denied. The Clerk of Court is directed is enter judgment accordingly and to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
          March 8, 2016                                        s/   Denis R. Hurley
                                                               Denis R. Hurley
                                                               United States District Judge

---

[12] Perry's violation of the Administrative Law Judge's sequestration order by sending a mass email to her former co-workers concerning two low level Cablevision employees she saw waiting to testify for the Company in what appears to be an attempt to intimidate these witnesses, *see* Margolis Declar. Ex. 1, further supports denial of interim relief.